USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/21/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
FELIX VEGA,                                            :
                                                       :          OPINION AND ORDER
                              Plaintiff,               :
                                                       :          05 Civ. 2286 (SAS)
          - against -                                  :
                                                       :
LARRY FOX, individually, and as a                      :
caseworker with YASL (Young Adult                      :
Supportive Living Program) of August                   :
Aichhorn Center for Adult Residential                  :
Care, Inc.; PAUL GREEN, individually,                  :
and as Site Supervisor with YASL of                    :
the August Aichhorn Center for Adult                   :
Residential Care, Inc.; MR. "JOHN"                     :
WASHINGTON, individually,                              :
and as caseworker with YASL of the                     :
August Aichhorn Center for Adult                       :
Residential Care, Inc.; MICHAEL                        :
PAWEL, individually, and as Director                   :
of August Aichorn Center                               :
for Adult Residential Care, Inc.;                      :
CARMEN L. TORRES, individually,                        :
and as Administrative Director of                      :
YASL of August Aichhorn Center                         :
for Adult Residential Care, Inc.; ROGER                :
YOUNGER, individually, and as Case                     :
Manager of YASL of August Aichhorn                     :
Center for Adult Residential Care, Inc.;               :
AUGUST AICHHORN CENTER                                 :
FOR ADULT RESIDENTIAL                                  :
CARE, INC.; WILLIAM BELL,                              :
individually, and as Commissioner                      :
of the Administration for Children's                   :
Services of the City of New York;                      :
SARAH LOGUNLEKO, individually,                         :

and as caseworker for the         :
**Administration for Children's** :
**Services of the City of New York; OLGA** :
**KOLMANOVSKY, individually, and as** :
**caseworker with the Administration for** :
**Children's Services of the City of New** :
**York; MARIA SANTIAGO, individually,** :
**and as the caseworker for the** :
**Administration for Children's Services** :
**of the City of New York; JEFFREY** :
**ANDERSON, individually, and as** :
**supervisor for the Administration for** :
**Children's Services of the City of New** :
**York; CITY OF NEW YORK; NAOMI** :
**VALLON, individually, and as** :
**Coordinator of the Jewish Board** :
**of Family and Children's Services;** :
**JEWISH BOARD OF FAMILY** :
**AND CHILDREN'S SERVICES, INC.,** :
        :
               **Defendants.** :
------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

In order to state a cause of action under section 1983 of Title 42 of

the United States Code ("section 1983"), a plaintiff must show that the conduct

complained of was committed by a person acting under color of law. This case

presents the thorny issue of whether a private entity and its employees may be

acting under color of state law in providing services to a young adult remaining in

foster care after his eighteenth birthday, where that entity is not directly controlled

-2-

by the state. Because a private entity's management or control may still be entwined with government, and because private actors have been delegated the public function of caring for mentally disabled, abused, or neglected young adults, they are not automatically immune from constitutional liability.

The claims in this litigation arise from an incident that occurred in December 2003 at the August Aichhorn Center for Adult Residential Care's Young Adult Supportive Living Program ("YASL"). The incident involved Felix Vega and Joseph Quiñones, both residents of the YASL. On February 23, 2005, Vega brought the instant suit, alleging constitutional violations and negligence. Several defendants filed cross-claims in response to his allegations.

August Aichhorn Center for Adult Residential Care, Inc. ("Aichhorn"), Michael Pawel (Director of Aichhorn), Lawrence Fox and Manengo Washington (caseworkers with the YASL), Paul Green (supervisor with the YASL), Carmen Torres (YASL Administrative Director), and Roger Younger (YASL Case Manager) (collectively "Aichhorn Defendants") now move for summary judgment with respect to the Complaint and all cross-claims. Aichhorn Defendants argue that the claims against them should be dismissed as a matter of law because they were not acting under color of state law and they owed no duty

-3-

to Vega.[1]  For the following reasons, the motion is denied.

## II.  BACKGROUND

In reviewing the evidence for the purpose of this motion, all reasonable inferences have been drawn in the plaintiff's favor.[2]

### A.  Aichhorn

Aichhorn is a not-for-profit corporation that was organized in 1977.[3] It has three programs that are all supervised by the same board of directors:  the Residential Treatment Facility ("RTF"), the Aichhorn School, and the YASL.[4] The annual budget for the entire organization in 2003 was approximately five million dollars.[5]  More than ninety-nine percent of this funding comes from

---

[1]     Aichhorn Defendants also argue that they should not be considered "agents" of the City of New York. *See* Def. Mem. at 16-17. While this is likely true, it is irrelevant to plaintiff's constitutional or negligence claims.

[2]     *See, e.g., Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

[3]     *See* 12/19/05 Deposition of Michael Pawel ("Pawel Tr."), Ex. 9 to 1/31/06 Declaration of Bruce A. Young, Attorney for Plaintiff ("1/31/06 Young Decl."), at 10.

[4]     *See id.* at 10, 14.

[5]     *See id.* at 26.

-4-

government sources.[6]  According to the founder and Executive Director, "[t]he vast majority of [Aichhorn's funding] is Medicaid per diem payments to the residential people of the facility.  The next largest amount [is] reimbursement for educational costs from the State Education Department."[7]  Most of the remaining funds consist of grants from the New York State Office of Mental Health ("OMH") for operation of the YASL.[8]

The RTF, which opened in 1991, is a long-term psychiatric treatment facility for teenagers, with thirty-two beds.[9]  It is funded by Medicaid and accredited by the Joint Commission For Youth Accreditation Health Care Organizations.[10]  Residents must be referred by the New York City Pre-Admission Certification Committee ("PACC"),[11] which is operated by the New York State

---

[6]     *See id.* at 28-29 (estimating that out of the five million dollar annual budget, $4,965,000 was from some source of public funding).

[7]     *Id.* at 29.

[8]     *See id.* at 14-15, 29.

[9]     *See id.* at 11.

[10]    *See id.*

[11]    According to Pawel, this Committee:

is set up under the statute that created the residential treatment facilities.  It operates on a regional basis. . . .  It is operated by the Mental Health Association of New York and it receives referrals

-5-

OMH.[12] The OMH was the source of capital funding and loan funds for the

construction of the Aichhorn RTF.[13] It also inspects and licenses the RTF,

provides supportive services, and generally oversees its operation.[14]

The YASL began operations in 1998.[15] It is described on the

Aichhorn website as follows:

The YASL is a co-educational supported living 'home' with 12

> of individuals who are considered by somebody to be in need of
> residential treatment and determines if they have such a need. If
> it determines such a need exists . . . it certifies their need, and it
> makes the referrals to the RTFs. That's true of all RTFs.

*Id.* at 58-59. When asked where children are often referred from, Pawel
mentioned State children's psychiatric centers, other residential treatment
facilities, criminal court, family court, the Office of Children and Family Services,
and group homes. *See id.* at 78.

[12]     *See* The August Aichhorn Center for Adolescent Residential Care,
Inc., Our Programs ("Aichhorn Program Description"), Ex. 10 to 1/31/06 Young
Decl., at 1, *available at* http://www.aichhorn.org/aichhome2.html.

[13]     *See* Pawel Tr. at 12.

[14]     *See id.* As a "condition of licensure of the facility," the Office of
Mental Health Bureau of Inspection and Certification conducts an in-person
inspection of the operation every twenty-four months. *Id.* at 72, 68. Aichhorn
must also "report untoward incidents, if any," to the OMH. *Id.* These incidents are
investigated, reviewed by an incident review committee, and reported to the State
if serious. *See id.* at 113-14. Another condition of licensure is that Aichhorn
formulate a manual regarding record-keeping, which is subject to approval by the
OMH. *See id.* at 106.

[15]     *See id.* at 15.

-6-

beds intended for young men and women (roughly 18 to 25) who have spent extended parts of their adolescence in congregate care settings (generally foster care or psychiatric facilities). It is located in a small brownstone on a rapidly 'gentrifying' residential block. It was developed, with support from the New York State Office of Mental Health (OMH), in response to the difficulties that many 'graduates' of the RTF program found in making the transition from the highly nurturing and protected program in which they had 'grown up' to the completely unstructured life of 'adults' with little or no family support. . . .

The YASL is considerably less closely structured than the RTF. It is not a licensed or accredited treatment program, but it does provide 24-hour onsite staff supervision, and extensive individual case management and counse[ling] services.[16]

The case management and counseling services provided at the YASL include

concrete assistance "in such activities as getting up in the morning, making an

appropriate appearance. . ., budgeting personal funds, shopping, cooking washing

clothes . . ., [and] attendance at medical appointments or other kinds of treatment

services," among other things.[17] The YASL receives "lump sum funding for

supportive services" from the OMH four times a year – the checks are made out to

Aichhorn.[18]

---

[16] Aichhorn Program Description at 3.

[17] Pawel Tr. at 53-54.

[18] *Id.* at 13, 17-18. Pawel estimates that each quarterly payment that the YASL receives from the OMH is between thirty and fifty thousand dollars. *See id.* at 20.

About half of YASL residents are admitted directly from Aichhorn's RTF, and half from outside referrals.[19] Residents must have some means of paying a subsidized rent and meeting their own living expenses.[20] Most YASL residents are eligible for Supplemental Security Income ("SSI") benefits, in which case they are required to designate Aichhorn as their representative payee.[21] Aichhorn receives and deposits the SSI checks and maintains an account for each resident.[22] Thirty percent of each SSI payment is withdrawn and spent as a rent payment to the YASL – this rate is set by government regulation as "an appropriate contribution that residents should be making toward their maintenance."[23] Other withdrawals from the residents' accounts are made in consultation with YASL case managers, who help the residents budget and manage their expenditures.[24]

**B.    Plaintiff's Claim**

Felix Vega has been in the New York City foster care system since he

---

[19]    *See* Aichhorn Program Description at 3.

[20]    *See id.*

[21]    *See* Pawel Tr. at 126.

[22]    *See id.* at 127.

[23]    *Id.* at 129.

[24]    *See id.* at 127-28.

-8-

was seven years old.[25] On June 18, 1998, when he was fourteen, Vega was placed

in Aichhorn's RTF.[26] He lived there until August 28, 2001, when he was

discharged from the RTF and became a resident at the YASL.[27] Shortly after his

eighteenth birthday in 2002, Vega signed an affidavit entitled, "Request to Remain

in Foster Care After 18th Birthday."[28] The Family Court approved Vega's

placement at the YASL as part of "the transition from foster care to independent

living."[29] At the time of the incident that precipitated this litigation, Vega was

nineteen years old and resided at the YASL.[30] He had been diagnosed with mental

---

[25]   *See* 10/10/05 Affidavit of Plaintiff Felix Vega ("Vega Aff."), Ex. 1 to
10/10/05 Declaration of Bruce A. Young ("10/10/05 Young Decl."), ¶ 16.

[26]   *See* 8/20/05 Affidavit of Michael Pawel ("Pawel Aff."), Ex. H to
9/7/05 Declaration of Edward L. Owen, Counsel to Aichhorn Defendants, in
Support of Motion for Summary Judgment ("Owen Decl."), ¶ 12.

[27]   *See id.* ¶ 13.

[28]   *See* 4/20/04 Examination of Felix Vega in the Matter of the Claim of
Felix Vega against the City of New York ("Vega Tr."), Ex. 3 to 10/10/05 Young
Decl., at 4; 6/12/02 Request to Remain in Foster Care After 18th Birthday, Ex. I to
Owen Decl.  Plaintiff disputes that the decision to sign this affidavit was
voluntary. *See, e.g.,* Vega Aff. ¶ 33.

[29]   *In the Matter of Felix Vega,* Docket No. NN-01167-92/03K, Order re:
Extension of Placement and Permanency Hearing (Dec. 16, 2003) ("12/16/03
Family Court Order"), Ex. 7 to 10/10/05 Young Decl., at 2.

[30]   *See* Aichhorn Defendants' Memorandum of Law in Support of
Motion for Summary Judgment ("Def. Mem.") at 3-4.

-9-

disabilities and was receiving SSI benefits.[31]

During that time, the YASL held meetings every Tuesday and Thursday with residents and staff.[32] On the afternoon of December 16, 2003, Vega and Quiñones were in attendance, as were employees of Aichhorn, including Larry Fox, Paul Green, and John Washington.[33] At the meeting, Vega stated that the door to his room did not lock, even though he had been complaining about the problem for some time.[34] He also reported that a gold chain had been stolen from his unlocked room.[35] Quiñones tried to change the subject, and he and Vega exchanged angry words.[36] As Quiñones approached Vega, Fox moved a table and

---

[31]   *See* Vega Aff. ¶ 4; Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl. Mem.") at 1.

[32]   *See* Vega Tr. at 17; Pawel Tr. at 45-46; Complaint ¶ 33.

[33]   *See* Complaint ¶ 33.

[34]   *See id.* ¶ 34.

[35]   *See id.* ¶ 36.

[36]   *See* Vega Tr. at 22. Vega and Quiñones had been involved in a prior altercation when they lived at the RTF, before they both moved to the YASL. Quiñones hit Vega, allegedly out of jealousy of Vega's relationship with a female. Quiñones was restrained and Vega was escorted back to his floor. *See id.* at 11-13.

said, "Let them fight until the cops come."[37] Quiñones threw a punch.[38] An altercation between Quiñones and Vega erupted.[39] Neither Fox, Green, Washington, nor any other Aichhorn employee intervened to stop the fight.[40] Vega's right arm was badly broken.[41] After the fight, Vega was taken to the hospital by ambulance – he underwent surgery and remained in the hospital for several days.[42]

On December 17, 2003, Quiñones was charged with assault and an order of protection was provided for Vega requiring Quiñones to stay away from Vega, his home, his school, and his place of employment.[43] Following Vega's medical treatment, he returned to the YASL, where Quiñones continued to

---

[37]     *Id.* at 23, 26.

[38]     *See id.* at 26.

[39]     *See* Complaint ¶ 37.

[40]     *See id.* ¶ 38.

[41]     *See id.* ¶¶ 42-43.

[42]     *See id.* ¶¶ 43, 47-49.

[43]     *See* Vega Aff. ¶ 14; 12/17/03 Order of Protection, Ex. 8 to 10/10/05 Young Decl.

-11-

reside.[44] After about two days, Vega moved out to live with his sister.[45]

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[46] An issue of fact is genuine if "the evidence is such that a jury could return a verdict for the nonmoving party."[47] A fact is material when it "might affect the outcome of the suit under the governing law."[48] The movant has the burden of demonstrating that no genuine issue of material fact exists.[49]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory

---

[44]     Vega Tr. at 33.

[45]     *See id.*

[46]     Fed. R. Civ. P. 56(c).

[47]     *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). *Accord Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

[48]     *Jeffreys*, 426 F.3d at 553 (quoting *Anderson*, 477 U.S. at 248).

[49]     *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

-12-

allegations or unsubstantiated speculation.'"[50] To do so, it must do more than

show that there is a "'metaphysical doubt as to the material facts.'"[51] In

determining whether a genuine issue of material fact exists, the court must

construe the evidence in the light most favorable to the non-moving party and

draw all justifiable inferences in that party's favor.[52]

## B.    Liability Under Section 1983 of Title 42 of the United States Code

Section 1983 creates no substantive rights, but does provide a

"mechanism for enforcing a right or benefit established elsewhere."[53] In order to

state a cause of action under section 1983, a plaintiff must show that the conduct

complained of was committed by a person or entity acting under color of state law,

and that the conduct deprived a person of rights, privileges, or immunities secured

---

[50]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express
Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[51]    *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[52]    *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir.
2004).

[53]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*,
423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808,
816 (1985)).

by the Constitution.[54]

## 1. Committed by a Person Acting Under Color of Law

### a. Under Color of Law

The Supreme Court has noted that in cases arising under section

1983, the "under color of law" requirement has been treated as the equivalent of

the "state action" requirement for a claim under the Fourteenth Amendment.[55] The

ultimate resolution of whether an actor was functioning under color of law or as a

state actor is a question of law for the court.[56] For private action to be considered

state action, "the conduct allegedly causing the deprivation of a federal right

[must] be fairly attributable to the State,"[57] meaning that there is "such a 'close

nexus between the State and the challenged action' that seemingly private

behavior 'may be fairly treated as that of the State itself.'"[58] "The purpose of [the

---

[54]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004). In the instant
motion, Aichhorn Defendants argue that they did not act under color of state law,
but they do not raise the issue of whether Vega was deprived of rights, privileges,
or immunities secured by the Constitution.

[55]    *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 928 (1982).

[56]    *See Blum v. Yaretsky*, 457 U.S. 991, 997 (1982) (noting that "whether
there is state action" is one of "several issues of law").

[57]    *Lugar,* 457 U.S. at 937.

[58]    *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531
U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345,

-14-

close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains."[59]

There is "'no single test to identify state actions and state actors.' Rather, there are 'a host of facts that can bear on the fairness of . . . an attribution' of a challenged action to the State."[60] The Second Circuit recently summarized Supreme Court jurisprudence on this point, finding that none of the following circumstances is *by itself* enough to make private conduct attributable to the state: (1) the private entity is a business subject to state regulation or "affected with the public interest";[61] (2) the private entity is created, funded, licensed or regulated by the government; or (3) the private entity's conduct is permitted but not compelled by state law.[62]

In *Brentwood Academy v. Tennessee Secondary School Athletic*

---

351 (1974)).

[59]    *Blum*, 457 U.S. at 1004.

[60]    *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) (quoting *Brentwood Acad.*, 531 U.S. at 296).

[61]    *Jackson*, 419 U.S. at 350.

[62]    *See Cranley v. National Life Ins. Co. of Vt.*, 318 F.3d 105, 111-12 (2d Cir. 2003).

-15-

*Association*, the Supreme Court listed relevant factors in the "necessarily

fact-bound inquiry"[63] into whether an act constitutes state action:

> Our cases have identified a host of facts that can bear on the
> fairness of such an attribution. We have, for example, held that
> a challenged activity may be state action when it results from
> the State's exercise of coercive power, when the State
> provides significant encouragement, either overt or covert, or
> when a private actor operates as a willful participant in joint
> activity with the State or its agents. We have treated a
> nominally private entity as a state actor when it is controlled
> by an agency of the State, when it has been delegated a public
> function by the State, when it is entwined with governmental
> policies, or when government is entwined in [its] management
> or control.[64]

The Second Circuit noted that *"Brentwood Academy* effectively broadened the

state action test to include 'entwinement' for the first time" and in so doing,

"acknowledged the flexibility of the test."[65]

In the context of government services such as foster care and mental

health care, the Second Circuit has long held that "private entities may be

considered to be infused with 'state action' if those private entities are performing

a function public or governmental in nature and which would have to be

---

[63]     531 U.S. at 298.

[64]     *Id.* at 296 (quotation marks and citations omitted).

[65]     *Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 230 (2d Cir.
2004).

-16-

performed by the Government but for the activities of the private parties."[66]  Thus,

in *Perez v. Sugarman*, the Second Circuit concluded that private institutional

defendants who were engaged in accepting and retaining custody of children

alleged to have been neglected or abandoned were engaged in state action.[67]  The

court relied on the pertinent provisions of the New York Social Services Law,

which declared that the state had assumed responsibility for children in need of

care and protection, and could either act directly or through private institutions in

discharging that responsibility.[68]  It is now well established in this circuit that

private child-care institutions authorized by New York's Social Services Law to

care for neglected children are acting "under color of state law" for purposes of

section 1983.[69]  Courts have also followed *Perez* where private entities are

---

[66]     *Perez v. Sugarman*, 499 F.2d 761, 764 (2d Cir. 1974).

[67]     *See id.*

[68]     *See id.* at 765-66.

[69]     *See, e.g., Duchesne v. Sugarman*, 566 F.2d 817, 822 n.4 (2d Cir.
1977); *Whalen v. Allers*, 302 F. Supp. 2d 194, 197 (S.D.N.Y. 2003); *Cecere v. City
of New York*, No. 88 Civ. 1948, 1991 WL 136026, at *3 (S.D.N.Y. July 12, 1991);
*Neustein v. Orbach*, 732 F. Supp. 333, 346 (E.D.N.Y. 1990); *Wilder v. Bernstein*,
645 F. Supp. 1292, 1315 (S.D.N.Y. 1986); *Brooks v. Richardson*, 478 F. Supp.
793, 795 (S.D.N.Y. 1979).

providing services for the mentally ill under the New York Mental Hygiene Law.[70]

### b. Personal Involvement

Liability under section 1983 requires that the defendant be personally involved in a constitutional deprivation; liability cannot be based on respondeat superior.[71] Broad, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient to impose liability.[72] "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[73] In *Colon v. Coughlin*, the Second Circuit identified five ways in which the personal

---

[70]   *See, e.g., Kasunic v. Webb*, No. 89 Civ. 6802, 1990 WL 104005, at \*5 (S.D.N.Y. July 16, 1990); *Flowers v. Webb*, 575 F. Supp. 1450 (E.D.N.Y. 1983); *Ruffler v. Phelps Mem'l Hosp.*, 453 F. Supp. 1062, 1068 (S.D.N.Y. 1978). *See also Kesselbrenner v. Anonymous*, 33 N.Y.2d 161, 166 (1973) (citations omitted) ("By provision of Constitution and statute the State is responsible for the care, treatment, rehabilitation, education, and training of the mentally ill.").

[71]   *See Monell v. Department of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978); *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005) ("As the Supreme Court discussed in *Monell*, Congress chose not to impose a federal law of respondeat superior, in part because it believed the imposition of an obligation on municipalities to keep the peace would raise constitutional problems.").

[72]   *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

[73]   *Monell*, 436 U.S. at 694.

-18-

involvement of a defendant may be shown:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[74]

Private employers are not liable under section 1983 for the constitutional torts of

their employees unless the plaintiff proves that "'action pursuant to official . . .

policy of some nature caused a constitutional tort.'"[75]

## C. Negligence

In order to prevail on a negligence claim under New York law, a

plaintiff must establish that the defendant: (1) owed a duty of care; (2) breached

that duty; and (3) that the breach was the proximate cause of the plaintiff's

---

[74]     58 F.3d 865, 873 (2d Cir. 1995). *Accord Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004).

[75]     *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (quoting *Monell*, 436 U.S. at 691). *Accord Johnson ex rel. Johnson v. Columbia Univ.*, No. 99 Civ. 3415, 2003 WL 22743675, at *3 (S.D.N.Y. Nov. 19, 2003).

injuries.[76] The existence of a duty of care is a "'legal, policy-laden declaration reserved for judges.'"[77] A plaintiff must establish not only that the defendant owed a general duty of care to society as a whole, but also that the defendant owed a specific duty to the particular plaintiff.[78]

Courts should "fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."[79] The New York Court of Appeals has explained that "duty is not something derived or discerned from an algebraic formula. . . . it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of

---

[76]    *See Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 394 (E.D.N.Y. 2004) (citing *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325 (1981)).

[77]    *In re September 11 Litig.*, 280 F. Supp. 2d 279, 290 (S.D.N.Y. 2003) (citing *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994)).

[78]    *See id.* at 290; *Leland v. Moran*, 100 F. Supp. 2d 140, 146 (N.D.N.Y. 2000); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001).

[79]    *Palka*, 83 N.Y.2d at 586. *Accord 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288 (2001) (citing *Hamilton*, 96 N.Y.2d at 232) (stating five factor balancing test); *In re September 11 Litig.*, 280 F. Supp. 2d at 290 (examining the five factors to determine the existence of a duty).

responsibility."[80]

"A defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control."[81] "A duty may arise, however, where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others."[82] Thus, New York courts have found that "[s]chools have a duty to provide supervision to ensure the safety of those students in their charge and are liable for foreseeable injuries proximately caused by the absence of adequate supervision."[83] In addition, "[l]iability may be imposed upon a state or its subdivisions for injuries sustained by children due to negligent oversight of the foster homes that care for them."[84]

---

[80]    *Palka*, 83 N.Y.2d at 585.

[81]    *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987).

[82]    *Hamilton*, 96 N.Y.2d at 233.

[83]    *Siller v. Mahopac Cent. Sch. Dist.*, 795 N.Y.S.2d 605, 605 (2d Dep't 2005) (citing *Mirand v. City of New York*, 84 N.Y.2d 44 (1994)).

[84]    *Sean M. v. City of New York*, 795 N.Y.S.2d 539, 550 (1st Dep't 2005). *Accord Tylena M. v. Heartshare Children's Servs.*, 390 F. Supp. 2d 296, 317 (S.D.N.Y. 2005).

Under New York law, an employer may be held liable for the
negligent acts of an employee based on a theory of respondeat superior. Employer
liability will be found where "an employee was engaged in the furtherance of the
employer's enterprise at the time of the employee's wrongdoing, and the employer
was or could have been exercising some control over the employee's activities."[85]

## IV. DISCUSSION

### A. Section 1983 Claims

#### 1. Under Color of Law

Aichhorn Defendants have attempted to narrow the state action
inquiry by asserting that they had no licensing, monetary, or supervisory
relationship with the City of New York.[86] But Aichhorn clearly does have such a
relationship with the New York State OMH. The OMH was involved with the
creation of Aichhorn, and makes all referrals to the RTF in addition to licensing,
regulating and overseeing its activities. Nevertheless, this case is a perfect
illustration of what has been called the "nebulous character of the state action

---

[85]   *Longin by Longin v. Kelly*, 875 F. Supp. 196, 201-02 (S.D.N.Y.
1995). *Accord Marino v. Vega*, 786 N.Y.S.2d 17, 18 (1st Dep't 2004).

[86]   *See, e.g.,* Def. Mem. at 12.

-22-

test."[87] No government actor has pervasive control over the day-to-day operations of either the RTF or YASL, and the YASL has no direct licensing or certification relationship with any state actor.

Based on the facts currently before the court, the RTF is more entwined with governmental action than the YASL. Nonetheless, the fact that the incident occurred at the YASL (as opposed to the RTF) cannot justify summary judgment on the state action issue for several reasons. *First*, the RTF and YASL are part of the same corporation, with the same board of directors, same pool of funds, similar goals, and an overlapping population of residents. They cannot be viewed as two distinct organisms solely to protect one of them from constitutional liability. *Second,* the YASL receives the vast majority of its funds from government sources, and maintains control of the SSI benefits rather than treating those funds as a private source of residents' income. The State sets the percentage of that SSI benefit that will be applied to rent. In addition, the YASL was originally developed with the support of the OMH, and the majority of its employees' salaries derive from state funds. *Third*, the YASL was subjected to ongoing, if indirect, oversight by the Administration for Children's Services and the Family Court, given Vega's status as a young adult remaining in foster care

---

[87]    *Tancredi*, 378 F.3d at 230.

after his eighteenth birthday.

*Fourth,* and most important under *Perez*, the care of mentally disabled, abused, or neglected children and young adults is squarely within the duty of the State. Both the New York Social Services Law and the New York Mental Hygiene Law provide numerous statutory protections to individuals in Vega's situation,[88] and many of these rights extend at least until a person's twenty-first birthday.[89] Over time, the State has delegated its statutory duties to a broad, complex network of publicly-funded private entities that undertake to provide

---

[88]     *See, e.g.,* N.Y. Soc. Serv. Law § 398 *et seq.* (McKinney 2003); N.Y. Mental Hyg. Law § 103 *et seq.* (McKinney 2003). *See also* N.Y. Comp. Codes R. & Regs. tit. 18, § 430.12(f)(4)(a) (2005) (stating that "every child deemed to have been discharged to independent living must remain in a status of trial discharge for at least six months after discharge and must remain in the custody of the local commissioner during the entire period of trial discharge" and enumerating the "after-care services" to which they are entitled); Rights of Outpatients in all Outpatient programs licensed or run by the Office of Mental Health, Ex. 11 to 1/31/06 Young Decl., *available at* http://www.omh.state.ny.us/omhweb/patientrights/outpatient_rts.htm.

[89]     *See* Pawel Tr. at 123 (stating that individuals in residential treatment facilities are entitled to receive services "until they reach their twenty-second birthday"); N.Y. Soc. Serv. Law § 398(6)(h) ("Commissioners of public welfare and city public welfare officers responsible under the provisions of a special or local law for the children hereinafter specified shall have powers and perform duties as follows: . . . Supervise children who have been cared for away from their families until such children become twenty-one years of age or until they are discharged to their own parents, relatives within the third degree or guardians, or adopted.").

required state services.[90]  In this case the public function being performed –

supervision and support of these mentally disabled young people – is directly

related to the specific acts which are alleged to be objectionable.  The incident at

issue "'directly involves defendants' mode of conducting the public function and

does not involve a collateral aspect of' the business of operating an institution

which cares for children.  The existence of this nexus has made the courts more

receptive to a finding of 'state action.'"[91]

Applying the standard of *Brentwood Academy* and its progeny, I find

that there is a material question of fact as to entwinement between Aichhorn and

the state.  And under *Perez*, private facilities that undertake to provide required

public services should not be able to avoid constitutional liability because they are

"private" rather than "public" entities.  Therefore, a reasonable jury could find that

the actions of the Aichhorn Defendants were state actions.

## 2.   Personal Involvement

---

[90]     *See Perez*, 499 F.2d at 766 ("[T]he New York Social Welfare Law
expressly contemplates the use of private facilities to accomplish the public
purpose here.  Indeed, these private entities are an integral part of the public
operation of providing assistance.  And . . . the dependence of the State on private
parties is a factor which tends to establish the intimacy requisite to a finding of
'state action.'") (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)).

[91]     *Id.* (quoting *United States v. Wiseman*, 445 F.2d 792, 796 (1971)).

-25-

### a. Fox, Green, and Washington

Fox, Green, and Washington are being sued individually and in their professional capacities as employees of the YASL. Fox and Washington are caseworkers, and Green is the site supervisor. All three defendants were present when Vega was injured. Because the constitutional claims in this case involve the alleged failure of defendants to protect Vega from assault, a defendant who was present at the scene of the incident directly participated in the alleged violation. Direct participation in an alleged constitutional violation constitutes personal involvement under *Colon v. Coughlin*.[92] Accordingly, summary judgment is inappropriate as to these defendants.

### b. Pawel, Torres, and Younger

Pawel is the Director of Aichhorn, Torres is the Administrative Director of YASL, and Younger is the Case Manager of YASL. Because none of them were present at the time of the incident, Vega cannot rely on the direct participation of these defendants to prove personal involvement. The most probable basis for liability of these defendants is that they "created a policy or custom under which unconstitutional practices occurred, or allowed the

---

[92]     *See* 58 F.3d at 873 ("the defendant participated directly in the alleged constitutional violation.").

continuance of such a policy or custom."[93]

Vega alleges that defendants promulgated policies that resulted in unconstitutional practices and failed to develop procedures to provide for the safety of YASL residents.[94] At this stage, the Aichhorn Defendants do not dispute this claim. Rather, they rely solely on the argument that the Aichhorn Defendants are not state actors. Because there is a genuine issue of material fact as to whether or not Aichhorn is a state actor, summary judgment is inappropriate as to these defendants.

### c.    Aichhorn

Because Section 1983 does not provide for liability on a respondeat superior theory, Aichhorn can only be liable for the acts of its employees if Vega can show that the employees' actions were taken "pursuant to [an] official . . . policy of some nature [that] caused a constitutional tort."[95]  As mentioned above,

---

[93]     *Id.* Vega does not proffer a theory or supporting facts that would satisfy the second, fourth, or fifth methods of establishing personal involvement under *Colon*.

[94]     *See* Complaint ¶ 69.

[95]     *Monell*, 436 U.S. at 691. *See also Johnson ex rel. Johnson*, 2003 WL 22743675, at *3 ("Thus, in order to sustain his claim . . . plaintiff must allege that Columbia has a policy, pattern or practice that caused his alleged injury."); *Mejia v. City of New York*, 228 F. Supp. 2d 234, 243 (E.D.N.Y. 2002) ("A municipality or a private corporation can be liable under *Monell* for the single act of an employee with final policymaking authority in the particular area involved.")

-27-

Vega argues that Aichhorn's policy decisions contributed to the alleged

constitutional violation, and the Aichhorn Defendants have not yet disputed this

allegation. Thus, summary judgment cannot be granted as to Aichhorn.

## B. Negligence

### 1. Fox, Green, and Washington

Defendants assert that the Aichhorn employees present during the

altercation between Vega and Quiñones had no duty to Vega.[96] Defendants rely

on the New York Court of Appeals decision in *Hamilton v. Beretta U.S.A. Corp.*

for the proposition that "[a] party does not normally have a duty to control the

conduct of third persons so as to prevent them from harming others."[97] While this

is true, the *Hamilton* court explains that there are several important exceptions to

this rule:

> A duty may arise, however, where there is a relationship . . .
> between defendant and plaintiff that requires defendant to protect
> plaintiff from the conduct of others. Examples of these
> relationships include master and servant, parent and child, and
> common carriers and their passengers.
>
> The key in each is that the defendant's relationship with either the
> tortfeasor or the plaintiff places the defendant in the best position

(citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-23 (1988)).

[96]    *See* Def. Mem. at 14-15.

[97]    *Id.* at 15 (citing *Hamilton*, 96 N.Y.2d at 232-34).

to protect against the risk of harm. In addition, the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship. We have, for instance, recognized that landowners have a duty to protect tenants, patrons or invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises.[98]

In this case, there is a relationship between social service providers and the "disabled young adults"[99] that they are helping that imposes a duty on the former to protect the latter from the conduct of others, to the extent reasonable under the circumstances. Aichhorn staff are the people in the best position to protect against harm to YASL residents from third parties. And imposing such a duty avoids the "specter of limitless liability" because it does not extend beyond the limited class of residents to the public at large.[100]

## 2. Pawel, Torres, and Younger

The Aichhorn Defendants urge that summary judgment is particularly appropriate as to those "who were not even present on the date of the incident."[101] But Pawel, Torres, and Younger were in a good position to prevent harm to

---

[98]    *Hamilton,* 96 N.Y.2d at 233.

[99]    Aichhorn Program Description at 3.

[100]    *Hamilton,* 96 N.Y.2d at 233

[101]    Def. Mem. at 15.

residents of the YASL, to the extent that this duty encompasses policy decisions of the organization. Defendants have not produced evidence or arguments that would preclude such a finding.

Also, in determining whether a defendant owes a duty, New York courts have asked whether the State owes a duty to provide the same services. In the case of foster care children, "the duty to care for the welfare of the children is imposed" by law, "including the responsibility to place the children in foster homes or other institutions under proper safeguards, to supervise the children while in foster homes, and to remove them from the foster home when necessary."[102] Indeed, state laws establish a broad set of affirmative duties owed to persons under twenty-one years of age who either reside in mental health treatment facilities or are supervised by the foster care system.[103] "It would be anomalous, to say the least, for . . . courts to preclude inquiry into the discharge of those duties."[104] Because a particular defendant at any level of the chain of the foster care or mental health care system was not at the scene of the alleged negligence does not mean as a matter of law that she lacks a duty to a plaintiff in

---

[102]    *Barnes v. County of Nassau*, 487 N.Y.S.2d 827, 830 (2d Dep't 1985) (citations omitted).

[103]    *See supra* notes 84-85 and accompanying text.

[104]    *Barnes*, 487 N.Y.S.2d at 830.

-30-

Vega's situation.

### 3. Aichhorn

As Aichhorn is the employer of all the Aichhorn Defendants, the doctrine of respondeat superior may be applied to hold Aichhorn liable for the actions of the individually named defendant-employees. Fox, Green, and Washington were clearly acting in the scope of their employment by supervising and leading a weekly meeting of YASL residents. Aichhorn has offered no evidence that the YASL has adopted training, rules, or guidelines concerning the management of violent situations, even though such situations are bound to arise in a residential facility for troubled young people with psychiatric disabilities.[105] A question of fact exists as to whether Aichhorn was *or could have been* exerting some influence over how Fox, Green, and Washington chose to act in the face of a physical altercation between residents or in the aftermath of that event.[106]

---

[105]    *See, e.g.,* Pawel Tr. at 93-98 (discussing the screening process for history of violent behavior).

[106]    *See, e.g., id.* at 102 (describing a lack of guidelines for escorting residents to criminal procedures); *id.* at 107 (lack of guidelines regarding record-keeping within the YASL); *id.* at 108-09 (lack of written rules for residents of the facility); *id.* at 110-11 (lack of policy regarding compliance with conflicting court orders).

## C.    Cross Claims

The Aichhorn Defendants have asked the Court to dispose of the cross claims against them as a matter of law because they all require some demonstration that defendants were negligent.[107]  Because the negligence claims are still viable, the cross claims cannot be dismissed.

## V.    CONCLUSION

For the reasons stated above, the Aichhorn Defendants' motion for summary judgment is denied.  The Clerk of the Court is directed to close this motion [number 18 on the docket sheet].  A conference is scheduled for April 3, 2006 at 10:30 a.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             February 21, 2006

_____

[107]    *See* Def. Mem. at 18.